# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 4, 2024

## IN RE KAITLYN D.[1]

### Appeal from the Circuit Court for Davidson County
No. 16A34    Philip E. Smith, Judge

_____

### No. M2023-00658-COA-R3-PT

_____

Mother appeals the termination of her parental rights to one of her children. The trial court found seven grounds for termination: abandonment by failure to support; persistent conditions; severe child abuse; imprisonment for more than two years; failure to visit; failure to manifest an ability or willingness to assume custody; and a risk of substantial harm. The trial court also determined that termination was in the child's best interest and terminated Mother's parental rights. Mother raises procedural and substantive challenges to the trial court's best interest determination but does not challenge the grounds for termination. Conducting a *Carrington* review, we conclude the trial court erred in finding some of the aforementioned grounds for termination. Nevertheless, because clear and convincing evidence supports at least one of termination grounds and the conclusion that termination is in the child's best interest, we affirm the trial court's termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Quinteoria D.

Paul W. Moser and Lisa P. Webb, Brentwood, Tennessee, for the appellee, Stephanie B.

Kristen Menke, Nashville, Tennessee, Guardian ad Litem for the minor child, Kaitlyn D.

_____

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

# OPINION

## I.

This appeal centers upon Appellant Quinteoria D. (Mother) and her parental rights as to Kaitlyn D. There are multiple other critical figures integral to this matter beyond Mother and Kaitlyn. Prominent among these individuals are the Appellee Stephanie B., who has cared for Kaitlyn almost since her birth and who filed the termination petition initiating this case, O'Neil H., who Mother contends is Kaitlyn's father but who has been almost entirely absent from her life, and Mother's aunt and uncle, Betty J. and Michael J. ("Mother's relatives"), who ostensibly intervened in hopes of one day adopting Kaitlyn themselves.

Kaitlyn was born in June 2015 into a tumultuous situation. At time of her birth, Mother and O'Neil H. were in the midst of navigating a Tennessee Department of Children's Services (DCS) investigation that arose in response to reports DCS received. These reports indicated that five of the couple's other children were the victims of medical and other forms of neglect including malnourishment. The State of Tennessee ultimately brought criminal charges for aggravated child neglect against Mother in connection with these allegations. According to Stephanie B., it was the fear that these legal actions would lead to Kaitlyn entering state custody that inspired Mother to contact her via Stephanie B.'s nephew, who apparently was dating Mother at the time. She testified that her "nephew . . . called [her] and asked . . . [her to] take the baby who had nowhere to go and was about to be placed in DCS custody." Stephanie B. agreed to assume custody three days after Kaitlyn's birth. This was originally to be a "short term" arrangement.

This short-term arrangement evolved over time. A major part of the evolution of this arrangement stemmed from Mother's failure to engage in meaningful visitation after Kaitlyn was born. The parties agree that Mother attended one of Kaitlyn's doctor's appointments, approximately two weeks after her birth, and two or three additional visits before the end of 2015. Regarding Kaitlyn's well-being, DCS helped to facilitate some child and family team meetings with Mother shortly after Kaitlyn was born to establish a roadmap for regaining custody.

DCS encouraged Mother to pursue services from Centerstone, which provides mental health and addiction treatment, and to "establish a relationship with Kaitlyn, provide financial assistance . . . and to complete classes." No evidence was presented that Mother ever attended any Centerstone programming or otherwise completed any action steps. Mother did send Kaitlyn "some diapers and an item of clothing . . . through a relative in December of 2015." No evidence was presented as to what efforts DCS made to assist Mother in taking the steps it had identified.

Mother did not prevail in either the DCS or criminal proceedings. Concerning the

DCS investigation, the Juvenile Court of Davidson County declared all six of Mother's children, including Kaitlyn, to be dependent and neglected on October 5, 2015. Regarding Kaitlyn specifically, the Juvenile Court stated that she "is a dependent and neglected child pursuant to T.C.A. 37-1-102(b)(12)(B), (F) and (G)," and that Mother failed to protect the children from O'Neil H. Additionally, the Juvenile Court concluded that one of Kaitlyn's siblings, also named O'Neil H., was the victim of severe child abuse. Neither Mother nor O'Neil H. appealed the October 2015 dependency and neglect decision. In 2016, Mother pled guilty to one count of attempted aggravated child neglect and received an eight-year sentence with one year to be served in confinement and the remainder of her sentence to be served on supervised probation. The exact date that Mother's incarceration began, however, is unclear.

The Juvenile Court also declared Stephanie B. to be the legal custodian of Kaitlyn in a 2015 order, apparently denying a competing custody petition filed by Mother's relatives. According to an order of disposition dated November 9, 2015, the Juvenile Court indicated that

> [s]ince [October], [Stephanie B.] and [Mother's relatives] have worked together in order to raise Kaitlyn . . . Accordingly, the parties are in agreement to place joint custody of Kaitlyn with [Stephanie B.] and [Mother's relatives]. The parties further agree [Stephanie B.] shall be considered primary residential custodian and [Mother's relatives] shall be considered alternative custodians.
>
> The parties further agree [Mother's relatives] shall have visitation every other weekend from 6:00 PM on Friday until 6:00 PM on Sunday, or as worked out amongst the parties. Should the parties be unable to agree, [Stephanie B.] shall make the ultimate decision. Due to the fact that [Mother's relatives] live in Chattanooga, [they] shall be responsible for transporting Kaitlyn to and from [Stephanie B.'s] home. The parties further agree they shall share alternating holidays . . .

All of the parties agree that Stephanie B. and Mother's relatives followed the general terms of this order. Mother's relatives saw Kaitlyn at their home in Chattanooga for approximately two weekends per month while Stephanie B. otherwise raised and cared for Kaitlyn. This order does not mention Mother or grant her any visitation. That silence animates much of the underlying controversy between the parties, as evidenced by the development of two starkly different renderings of Kaitlyn's upbringing that were painted at trial.

According to Stephanie B., whom the trial court found to be "truthful and straightforward," the court-ordered visitation arrangement went according to plan without many complications or hostilities. She testified that she has devoted herself to raising

Kaitlyn in the best environment that she could create. She painted a positive picture of Kaitlyn's life. She testified that Kaitlyn had her own room in Stephanie B.'s home, attended elementary school in Davidson County, is "a cheerleader . . . working on her spirit stick," loves to sing, participates in the church choir with Stephanie B., and "loves to draw."

By May 2016, Stephanie B. felt so bonded to Kaitlyn that she initiated the termination action at issue in this appeal. She sought to terminate Mother's rights to Kaitlyn and Mother's relatives' alternative custodian status in anticipation of an adoption that she requested in the same petition. Stephanie B. later amended her termination and adoption petition in March 2017, adding O'Neil H. as a party for the first time. Stephanie B. invoked six separate grounds for termination: (a) that Kaitlyn was "removed from the home of the parent by court order for a period of time more than six (6) months[,] and the conditions that led to the removal in all reasonable probability would cause the minor child to be subject to further abuse or neglect"; (b) that the Juvenile Court of Davidson County concluded that Mother committed severe child abuse in the context of "a half-sibling of [Kaitlyn]"; (c) that Mother was "sentenced to more than two (2) years of imprisonment for conduct against a half-sibling of [Kaitlyn]"; (d) that O'Neil H. *and* Mother failed to visit Kaitlyn "for more than four (4) months preceding the filing of this Petition," though citing the statutory provision related to a putative father's failure to visit; (e) that O'Neil H. *and* Mother failed to manifest an ability or willingness to assume custody of Kaitlyn, though again citing to the putative fathers' statutory provision; and (f) that returning Kaitlyn to O'Neil H. *and* Mother's care "would pose a substantial risk of harm," though again citing to the putative fathers' statutory provision. Stephanie B. additionally alleged in her amended petition that termination was in Kaitlyn's best interest.

None of the parties dispute that O'Neil H. failed to participate in any facet of this case. He ignored requests for additional information from the parties and DCS. The trial court ultimately entered a default judgment against O'Neil H., terminating his rights to Kaitlyn. O'Neil H. has continued to remain uninvolved in this appeal. This appeal concerns Stephanie B.'s petition as it pertains to Mother.

According to Stephanie B., she and Mother rarely interacted following Mother's release to supervised probation in July 2017. The trial court found that "Mother called [Stephanie B.] and came to see Kaitlyn on one occasion in 2018 or 2019. [Stephanie B.] was unsure of the year and the age of Kaitlyn when this visit occurred, but stated that the visit did not go well because [Kaitlyn] did not know who her mother was, and the visit ended with the police being called."

Stephanie B. also testified that she and Mother's relatives eventually came to an agreement about Kaitlyn's future following the initiation of the termination action. Stephanie B. entered into evidence a "Post-Adoption Agreement" signed by her and Mother's relatives on November 13, 2019, that purported to establish visitation schedules for Mother's relatives following "the uncontested adoption of the Minor Child" by

Stephanie B. The agreement treats Stephanie B.'s anticipated adoption of Kaitlyn as final "[a]fter the entry of an order of adoption," and specifically states that "[a] disagreement between the parties or litigation brought to enforce or modify this contract shall not affect the validity of the adoption and cannot serve as a basis for orders affecting the custody of the Minor Child." According to Stephanie B., there was no hint from Mother's relatives that they disagreed with any of the terms of the agreement or with Stephanie B. adopting Kaitlyn prior to the October 5, 2022 hearing on her termination petition.

By contrast, Mother, whom the trial court found "grossly unreliable" and "not credible," told an entirely different story about the circumstances following her incarceration while on supervised probation.[2] According to Mother—and entirely unbeknownst to Stephanie B.—Mother allegedly visited Kaitlyn approximately once per month, including while still serving her prison sentence prior to her mid-2017 release on probation, during Mother's relatives' weekend visitation periods. Mother contends that she paid for all of Kaitlyn's needs during these once-a-month visits, styling these contributions as a form of child support, though she admitted at the hearing that she never once sent Stephanie B. any form of financial assistance following her release on probation. Under her version of events, Mother utilized her relatives' weekend visitation periods to build a bond with Kaitlyn, introduce Kaitlyn to some of her half-siblings, and to engage in various activities in the Chattanooga area, such as a trip to the aquarium. Mother insisted that Kaitlyn calls her "mom," but testimony indicates that Kaitlyn called Stephanie B. "mom." Additionally, Mother indicated that she provided Kaitlyn with a cellphone to be used only at her relatives' Chattanooga home as a way to meet Mother's fiancé, Mr. Pierson, via Facetime. Mother testified that she and Mr. Pierson were married. However, when Mr. Pierson took the stand after Mother's testimony, he referred to Mother as his fiancée. Having learned that Mother and Mr. Pierson were not actually married, the trial court admonished Mother from the bench for testifying that they were married when no marriage had occurred.

Stephanie B. indicated that this testimony at trial was the first she had ever heard of these visits with Mother. When Mother was asked whether she or her relatives had told Kaitlyn to refrain from sharing details of these alleged visits with Stephanie B., Mother denied interfering in Kaitlyn's relationship with Stephanie B. On cross examination, Mother could not identify her relatives' address, could not indicate how many times she had visited Kaitlyn in the past year, could not indicate how many visits had occurred over various months, and could not quantify the amount of money she claimed to have spent on Kaitlyn between 2018 and 2022.

---

[2] Stephanie B. called Radina Cruz, the current custodian of Kaitlyn's half-sibling O'Neil H., as a rebuttal witness. Ms. Cruz testified about her past interactions with Mother. Based on her testimony, the trial court included a finding in its order that "Mother is historically an untruthful person." Ms. Cruz testified favorably about Kaitlyn's relationship with Stephanie B. and as to the existence of a meaningful relationship that Kaitlyn has with her sibling O'Neil H., which has been facilitated by Stephanie B. and which would not survive were Mother parenting Kaitlyn.

Mr. Pierson, whom the trial court considered credible, briefly took the stand to address Mother's development as a parent after being released. According to him, Mother regained custody of four of her six children and currently lives with him and the rest of the children as to whom she has custody in a home in Nashville. Mr. Pierson confirmed that Mother works with him at a logistics company. He also testified that he believed that he and Mother could provide a safe living space for Kaitlyn and he "is willing to allow [Kaitlyn] to come into their home and live with them."

Mother's aunt, Betty J., also testified. The trial court found the testimony of Betty J. to be "unclear and confusing." Betty J.'s testimony was similar to Mother's testimony in some respects but contradicted Mother in important ways. For example, Betty J. did testify that she and her husband turned their weekend visitation periods into times where Mother could visit Kaitlyn, but she also clarified that these visits were far less frequent than Mother had claimed during her testimony. Whereas Mother testified that she visited Kaitlyn approximately once a month, Betty J. testified that Mother had essentially visited at a rate of once per quarter in the year preceding trial. Betty J. testified that she too allegedly never told Kaitlyn to keep these visits with Mother a secret or to otherwise hide details from Stephanie B. Betty J. testified that her relationship with Stephanie B. was somewhat acrimonious. Yet, Betty J. declined a request from the trial court to explain this acrimonious relationship as illustrated in the following exchange:

> [Betty J.]: It's a lot to this story that I'm just going to leave alone . . . If you knew the story from the beginning, it would be shocking.
>
> [Trial Court]: Tell us what it is.
>
> [Betty J.]: Oh, it's too much.
>
> [Trial Court]: Okay. All right. . .

Betty J. testified that she purposefully declined to share any details with Stephanie B. about Mother's alleged visits with Kaitlyn. Additionally, Betty J. contended that neither she nor her husband ever informed Mother that they had entered the Post-Adoption Agreement with Stephanie B. regarding Kaitlyn. Betty J. testified that she and her husband apparently showed Mother a copy of the document but suggested that perhaps Mother did not ever read it. Following this testimony, Betty J. appeared to spontaneously recant her and her husband's consent to allow Stephanie B. to adopt Kaitlyn for the first time since signing the agreement three years prior. This led to an extensive debate in the middle of the hearing over the validity of the Post Adoption Agreement ratified by the witnesses, resulting in the following statement from the trial court:

> Well, I guess this [adoption] is contested then. What a predicament we're all

in. . . . When you signed this agreement [Betty J.], did you not think that it would be appropriate to tell [Stephanie B.] knowing that she was going to adopt this child, that during your visitations, you were bringing in all these other people to have an effect on Kaitlyn, like the birth mother[?] . . . Why did [you] not tell her that you were bringing these people in? It probably would have saved us a lot of trouble here. . . . It makes it more real complicated. It looks like that you had a plan, you had a plan here, but you were telling one person something and telling another person something else. . . .

I've got testimony that somebody is not credible in this mix and I've got to sort out who it is here. . . . I just think that we should keep Kaitlyn out of the mix, especially from the testimony of [Betty J.], because her feelings were very bold.

[Betty J.] didn't want this adoption to happen now, but she signed an agreement. And I think she's put [Stephanie B.] and the birth mother in a precarious position, because I don't think the birth mother knew [about the agreement]. I don't know how much she knew. I wish she would have read that [agreement] when she was shown that. She may have had an opinion on it or maybe not. I don't know.

Based on the October 5, 2022 hearing on Stephanie B.'s termination and adoption petition, the trial court promptly entered an order terminating Mother's relatives' twice-per-month visitation schedule while taking the remainder of the merits under advisement. Though Mother's relatives objected, the trial court stated at the end of the hearing that it believed entering this order would be best while it sorted through the appropriate route forward for Kaitlyn.

On April 11, 2023, the trial court issued its "Order and Findings of Fact and Conclusions of Law" granting the portion of Stephanie B.'s petition dedicated to terminating Mother's parental rights to Kaitlyn.[3] Addressing the grounds for termination, the trial court's order begins with the ground of abandonment by failure to support pursuant to Tennessee Code Annotated section 36-1-113(g)(1). Based on Stephanie B.'s testimony that she only received approximately forty dollars of support, an item of clothing, and some diapers, the trial court found this termination ground to be established by clear and convincing evidence. This ground, however, was not included in Stephanie B.'s list of grounds for termination in her amended petition. The trial court also found six other

---

[3] The trial court stated at the outset of its order that "the pending Petition is one for termination of parental rights and adoption; however, the Court is only dealing with the adoption portion of the pending petition." This appears to be a scrivener's error, since the substance of the trial court's order actually only deals with the termination portion of Stephanie B.'s petition.

grounds for termination. Specifically, it concluded: (1) concerning persistent conditions under subsection 113(g)(3), Mother failed to follow the action plan developed by DCS following Kaitlyn's birth, "had approximately 7 years to devise a plan to reunite with her child and provide for her care but has failed to present one to the Court at this crucial juncture in the proceedings or at any time prior to trial," and that returning Kaitlyn to Mother's care would lead to additional abuse or neglect "[i]n all reasonable probability"; (2 and 3) regarding the severe abuse and imprisonment grounds, the trial court noted that Mother stipulated to these grounds and Stephanie B. entered into evidence sufficient documentation to establish clear and convincing proof of both of these grounds; (4, 5, and 6) regarding the three grounds for which the petition cited to putative fathers subsection, 113(g)(9), the trial court found that clear and convincing evidence was presented that Mother failed to visit, that Mother failed to manifest an ability or willingness to assume custody, and that reuniting Kaitlyn with Mother would like pose a risk of substantial harm to Kaitlyn.

Having determined grounds for termination of parental rights had been established by clear and convincing evidence, the trial court considered Kaitlyn's best interests. Analyzing the factors set forth in a list of twenty best interest factors identified for consideration in Tennessee Code Annotated section 36-1-113, the trial court determined that the majority of these factors weighed in favor of termination. The trial court ultimately concluded that termination was in the best interest of Kaitlyn and granted Stephanie B.'s petition to terminate Mother's parental rights. The trial court also found that Mother's relatives "g[ave] Kaitlyn information about the Mother and her other siblings and instruct[ed] her to keep secrets from [Stephanie B.], thereby putting Kaitlyn in the middle" of the ongoing controversy between the parties.

Mother appeals the trial court's termination order, raising two issues for review.[4] One, Mother contends that the trial court engaged in reversible error by relying on the wrong list of best interest factors. Instead of using the list of nine factors in effect at the time that Stephanie B. filed her termination petition and amended termination petition, Mother points out the trial court instead relied on the expanded list adopted by the General Assembly years after Stephanie B.'s filing. She argues that this error demands reversal. Mother also contends that termination was not in Kaitlyn's best interest even under the now-expanded list of best interest factors. Stephanie B. defends the trial court's decision in both respects. Mother does not challenge the trial court's findings as to any of the

---

[4] While Mother's relatives are parties to this action, they did not submit briefing by the original deadline. Once this deadline passed, the clerk's office "entered an administrative order . . . requiring Michael J. [and] Betty J. . . . either to file a brief within ten days or else to show cause why the appeal should not be submitted to the Court for a decision on the record and the other parties' briefs." Mother's relatives did not respond. Accordingly, this court entered an order on November 1, 2023, indicating that "this appeal shall be submitted for a decision without a brief" from Mother's relatives. Relatedly, O'Neil H. also has not participated in this appeal, and a similar order was issued providing for this court to reach a decision in the case without briefing from him.

grounds for termination.

## II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in Kaitlyn's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

The trial court found seven statutory grounds for termination to have been established by clear and convincing evidence. As noted above, Mother does not challenge the trial court's findings as to any of the grounds. The Tennessee Supreme Court, however, has directed this court to "review the trial court's findings as to each ground for termination and as to whether termination is in [Kaitlyn's] best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26; *see also In re Collwynn J.*, No. E2020-00726-COA-R3-PT, 2020 WL 7319549, at *2-3 (Tenn. Ct. App. Dec. 11, 2020) (reviewing every ground for termination despite the fact that the parents "stipulated the statutory grounds for termination"). In conducting this

*Carrington* review of termination grounds, this case, like many others, presents circumstances in which the resolution of whether some termination grounds have been established by clear and convincing evidence is extremely clear while the consideration of other grounds presents significant factual and legal quandaries. This challenge is exacerbated in cases such as the present one in which there is no briefing on these matters from the parties. Ultimately, in this case, we conclude that the trial court erred, for varying reasons, as to the termination grounds of abandonment by failure to support, persistent conditions, and failure to visit. We conclude, however, the trial court did not err as to the termination grounds of severe child abuse, a parent sentenced to more than two years imprisonment for severe child abuse, and failure to manifest a willingness and ability to assume custody and risk of substantial harm.

### A. Abandonment by Failure to Support

The trial court found that clear and convincing evidence established that Mother abandoned Kaitlyn by failing to provide anything more than token financial support. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective Mar. 23, 2016, to Jun. 30, 2016); Tenn. Code Ann. § 36-1-102(1)(B) (effective Mar. 23, 2016, to Jun. 30, 2016) (defining token support as contributions that "under the circumstances of the individual case, [are] insignificant given the parent's means").[5]

After reviewing Stephanie B.'s petition and amended petition for termination, it does not, however, appear that Stephanie B. invoked abandonment by failure to support as a ground for termination. Her petition provides a succinct list of grounds upon which she sought termination at paragraph twenty-one. Notably, that list does not include a reference to abandonment by failure to support. Only in paragraph twelve, which is separate from Stephanie B.'s list of grounds, does Stephanie B. mention Mother's lack of support. It reads, "Prior to the aforementioned abuse allegations and subsequent criminal charges, Mother failed to pay or offer any support for the minor child with the exception of forty dollars ($40.00) worth of clothing and diapers provided to [Stephanie B.] soon after Kaitlyn's birth." In its order, the trial court asserted that Stephanie B. "relied upon the definition [of abandonment] set forth in Tennessee Code Annotated § 36-1-102(1)(A)(i)" and provided a copy of the statutory text to reference in its order. That same statutory text and citation do not, however, appear in Stephanie B.'s termination petitions. Further

---

[5] *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed."). The parties do not address whether the applicable statutory provisions are those in effect on the date of the filing of Stephanie B.'s petition or amended petition. With regard to the ground of abandonment by failure to support, we note that language at the time of the filing of the petition and amended petition was identical. It provided for assessing abandonment in relation to "a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate." Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective March 23, 2016 to June 30, 2016); Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2016 to June 30, 2018).

complicating this factor, the trial court faulted Mother for not raising the affirmative defense of willfulness despite willfulness not having to be asserted an affirmative defense under the version of the statute in effect at the time Stephanie B. filed her termination petition. *Compare* Tenn. Code Ann. § 36-1-102(1)(I) (effective July 1, 2023) (providing that "absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure") *with* Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective Mar. 23, 2016, to Jun. 30, 2016) (defining abandonment, in part, as "the parent or parents . . . have willfully failed to visit").

This court has repeatedly stressed the importance of pleading in the context of parental termination to provide notice to the parent named in a termination petition. *See, e.g., In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *6 (Tenn. Ct. App. Nov. 10, 2021) (collecting cases); *In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *9 (Tenn. Ct. App. Jun. 17, 2020) (concluding reversal for lack of pleading avoided only because "counsel for DCS announced that it was pursuing termination of Mother's rights on this ground as well [at the outset of trial]"); *In re Paisley J.*, No. W2022-01059-COA-R3-PT, 2023 WL 4417390, at *8 (Tenn. Ct. App. July 10, 2023) (reversing failure to visit or support grounds because "Petitioners did not allege that Father had failed to visit or support . . . during the four months preceding the filing of their amended petition but rather that four months preceding Father's unspecified incarceration date"); *In re Allainah B.*, No. M2020-01381-COA-R3-PT, 2021 WL 4453465, at *7 (Tenn. Ct. App. Sept. 29, 2021) (vacating portion of termination order because "Petitioners pled an inapplicable ground for termination."); *In re Disnie P*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *9 (finding lack of notice where "[t]he word 'support' does not appear in the section concerning the ground in Petitioners' second amended petition; it only appears in the section concerning the ground of failure to manifest an ability and willingness"). "In the context of parental termination, due process requires that the parent be notified of the alleged grounds for termination." *In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *3 (Tenn. Ct. App. May 28, 2021) (citing *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *8 (Tenn. Ct. App. May 2, 2017)). "[P]arental rights may be terminated only upon the statutory ground(s) alleged in the petition because otherwise the parent would be disadvantage[d] in preparing a defense." *In re Disnie P.*, 2023 WL 2396557, at *9 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re Lauren F.*, 2021 WL 5234712, at *11) (internal quotation marks omitted). Here, abandonment by failure to support does not appear as part of the grounds outlined by Stephanie B. in seeking termination. Having elsewhere identified the grounds for termination, not including failure to support, a fleeting reference to Mother's lack of support in an entirely separate section of the petition is not enough to place Mother on notice that this ground was raised against her as a ground for termination. *See In re Disnie P*, 2023 WL 2396557, at *9.

Nevertheless, reversal would not be warranted if the ground of abandonment by failure to visit had been tried by implied consent. *See id.* When examining an unpled

- 11 -

ground for termination, however, the implied consent analysis is more stringent.  "[I]t must be clear from the record that any 'evidence presented that is relevant to the unpled ground had no relevance to any other issues being presented to the Trial Court'" in order to conclude that an additional ground for termination was tried by implied consent.  *Id.* (quoting *In re Lauren F.*, 2021 WL 5234712, at *11); *In re Paisley J.*, 2023 WL 4417390, at *9 (same).

The abandonment by failure to support ground fails this test.  Testimony from Stephanie B., Betty J. and Mother concerning Mother's support payments (or lack thereof) are directly relevant, at a minimum, to the best interest analysis, which accounts for Mother's history of providing financial support.  We are unconvinced that abandonment by failure to support was "properly raised in the pleadings" or "tried by consent of the parties."  *See In re Lauren F.*, 2021 WL 5234712, at *12.  Accordingly, we conclude the trial court erred in finding this ground for termination, which was not properly before the court.

## B. Persistent Conditions

The trial court also found that clear and convincing evidence established the ground of termination based upon persistent conditions.  Parental rights may be terminated for the persistence of conditions when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (effective Mar. 23, 2016, to Jun. 30, 2016).

The basic prerequisite to this ground was established through the dependency and neglect adjudicatory order indicating Kaitlyn was removed from Mother's custody and

from testimony that Kaitlyn's removal lasted more than six months. Accordingly, the trial court's next task was to consider the criteria outlined above in subsections 113(g)(3)(A-C).

The remaining findings by the trial court related to this ground are, essentially, as follows: (1) Mother did not follow the DCS action plan;[6] ; (2) Mother did not contact Kaitlyn "between June 2015 [and] some unknown date in 2018"; and (3) "the conditions that led to [Kaitlyn's] removal still persist and those conditions prevent [Kaitlyn's] safe return to the care of Mother. In all reasonable probability, the return of [Kaitlyn] to Mother would cause [Kaitlyn] to be subjected to further abuse or neglect." The trial court's order does not identify what conditions are being evaluated or explain that these conditions persisted or how they posed a danger to Kaitlyn's safety.

Review of this termination ground on appeal is further complicated by certain aspects of this case and of the trial court's other findings. One, Mr. Pierson, whom the trial court deemed credible, provided a glowing appraisal of Mother's improvements as parent since her incarceration. Mr. Pierson testified that the home that he shares with Mother constitutes a safe environment in which Kaitlyn could be raised. Two, the underlying order of dependency and neglect was deeply intertwined with the actions of O'Neil H. and Mother's failure to safeguard her children from serious danger that he posed. O'Neil H. now appears to be totally absent from Mother's life. Three, the DCS plan for Mother was not entered into evidence, creating complications in understanding precisely what action steps were directed that Mother failed to pursue. Under these circumstances, without direction from the trial court as to what conditions persisted that caused it concern, it is difficult to evaluate this ground for termination.

We conclude that Tennessee's parental termination statute requires more thoroughness. Section 113(k) requires trial courts to make "specific findings of fact." Tenn. Code Ann. § 36-1-113(k). The trial court may be correct that this ground may have been established, but based upon the record before us given the findings made by the trial court, we cannot adequately review the trial court's determination as to persistent conditions. Thus, we vacate the portion of the trial court's order finding the termination ground of persistent conditions to have been established by clear and convincing evidence. However, because we ultimately affirm the trial court's judgment upon other grounds for reasons discussed below, there is no purpose served by the trial court further addressing the issue on remand.

C. Severe Child Abuse

A parent's rights to his or her child may be terminated on the basis of severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4). Tennessee law provides that termination may be warranted where,

---

[6] We note the DCS plan was not entered into evidence.

- 13 -

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

*Id.* (effective Mar. 23, 2016, to Jun. 30, 2016).

Mother stipulated to this ground, but such stipulation does not relieve the obligation to evaluate the ground for termination.[7] Here, the trial court relied upon the Juvenile Court of Davidson County's adjudicatory order from the dependency and neglect hearing. *See In re Heaven L.F.*, 311 S.W.3d 435, 439-440 (Tenn. Ct. App. 2010). The order establishes that Mother was a perpetrator of severe child abuse against "any sibling or half-sibling" of Kaitlyn. *See* Tenn. Code Ann. § 36-1-113(g)(4). There was no appeal by Mother from this decision, which became final. The trial court did not err in concluding that the ground of severe child abuse was established by clear and convincing evidence.

### D. Sentenced to More Than Two (2) Years Imprisonment

The trial court also concluded that Mother's prison sentence constituted a ground for termination. According to Tennessee parental termination statute, termination may be warranted if,

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian. . . .

Tenn. Code Ann. § 36-1-113(g)(5) (effective Mar. 23, 2016, to Jun. 30, 2016).

---

[7] *In re Layton W.*, No. M2020-00197-COA-R3-PT, 2020 WL 5944053, at *2 (Tenn. Ct. App. Sept. 2, 2020) (addressing continuing judicial obligations despite stipulation of a termination ground).

- 14 -

Mother also stipulated to this ground, but as noted above, such stipulation does not relieve the obligation to evaluate the ground for termination.[8] The trial court heard testimony and viewed exhibits showing Mother received an eight-year sentence as a result of pleading guilty to one count of attempted aggravated child neglect for the same conduct that, as noted above, the trial court found to be severe abuse perpetrated by Mother under Tennessee Annotated section 37-1-102.[9] The Judgment and Amendment Judgment in connection with these convictions were entered into evidence. They both specify that an eight-year sentence was imposed for a Class B felony. The minimum "term[] of imprisonment" for a Class B felony is "not less than eight (8)" years. Tenn. Code Ann. § 40-35-111(b)(2). Tennessee Code Annotated section 40-35-303(c)(1) provides,

> If the court determines that a period of probation is appropriate, the court shall sentence the defendant to a specific sentence but shall suspend the execution of all or part of the sentence and place the defendant on supervised or unsupervised probation either immediately or after a period of confinement for a period of time no less than the minimum sentence allowed under the classification and up to and including the statutory maximum time for the class of the conviction offense.

(Effective July 1, 2014 to June 30, 2016).

---

[8] *In re Layton W.*, 2020 WL 5944053, at *2 (addressing continuing judicial obligations despite stipulation of a termination ground).

[9] The guardian ad litem inquired about the connection between Kaitlyn and Mother's conviction during Stephanie B.'s cross examination:

[GAL]: The first [document] is the date of entry of judgment in the bottom right-hand corner is February 26th; do you see that?

[Stephanie B.]: Yes, I do see that.
. . .

[GAL]: Okay. And what [Mother] actually pled guilty to was attempted child neglect, correct?

[Stephanie B.] It looks like it's attempted aggravated child neglect.
. . .

[GAL]: All right. So, what is listed on this judgment here shows [Mother] perpetrating against the sibling of [Kaitlyn] in 2014 at least during part of the time she was pregnant with [Kaitlyn], correct?

[Stephanie B.]: Yes.

- 15 -

That is precisely what the trial court did in sentencing Mother to eight years of imprisonment but suspending seven years of incarceration in favor of one year of incarceration with seven years of supervised probation. This court has found such sentences to fall within the ambit of the termination ground set forth in Tennessee Code Annotated section 36-1-113(g)(5). *See, e.g.*, *In re B.A.*, No. W-2019-00129-COA-R3-PT, 2019 WL 5884608, at *4 (Tenn. Ct. App. Nov. 12, 2019) (concluding that the trial court properly found this termination ground where a father received an eight-year sentence with one year to be served in jail and the remainder on probation)*; In re Adrian M.*, No. W-2019-00931-COA-R3-PT, 2019 WL 5595846, at *11 (Tenn. Ct. App. Oct. 30, 2019) (finding that (g)(5) termination ground is satisfied with an eight-year sentence suspended to eight years of supervised probation); *see also In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *7 (Tenn. Ct. App. July 21, 2014) (concluding that sentences that provide for suspension of incarceration for non-confinement probation qualify under (g)(5)). Accordingly, the trial court correctly concluded that clear and convincing evidence established this ground for termination.

### E. Failure to Visit

The trial court found that the ground for termination based upon failure to visit was proven by clear and convincing evidence. Review of this ground for termination is complicated by at least five intertwined aspects of the parties' filings and the trial court's decision.

One, the trial court found the termination ground of failure to visit pursuant to "Tenn. Code Ann. § 36-1-113 (g)(9)(A)(iii)." In doing so, the trial court expressly quoted the following statutory language: "(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(l)(c)." The problem with this conclusion is that Tennessee Code Annotated section 36-1-113 (g)(9)(A)(iii) applies to putative fathers, and Mother is not a putative father. *See* Tennessee Code Annotated section 36-1-113 (g)(9)(A).[10]

Two, this does not appear to be a mere scrivener's error by the trial court but instead is responsive to the pleadings in the petition to terminate and amended petition to terminate. In her termination petitions, in seeking termination connected with failure to visit, Stephanie B. expressly referenced Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii), which, as noted above, applies to putative fathers. Stephanie B., however, in her amended petition also cited the definition of abandonment in Code Annotated § 36-1-102(1)(A)(i) in connection with failure to visit, which is applicable as a termination of parents' rights,

---

[10] There is no indication from the record that Mother regarded this statutory measure as inapplicable to her on that basis or presented any such argument to the trial court. In other words, we are not confronted with a case in which Mother's argument before the trial court was tied to the mistaken citation.

rather than solely putative fathers' rights, under Tennessee Code Annotated section 36-1-113(g)(1).

Three, in referencing abandonment in her amended petition, Stephanie B. expressly alleges a failure to visit "for more than the four (4) months preceding the filing of this Petition." However, Mother was in prison when the petition and amended petitions to terminate were filed. Accordingly, the time period for assessing failure to visit is not the four months preceding the petition but instead prior to incarceration -- specifically the "four (4) consecutive months immediately preceding such parent's or guardian's incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (effective July 1, 2016 to June 30, 2018). The trial court, however, made its findings with regard to failure to visit in connection with the time period for the filing of the petition, finding a lack of visitation "for four (4) months prior to the filing of the Petition." This is further complicated insofar as the record contains conflicting information as to precisely when Mother was in jail or prison. The trial court did, however, suggest that Mother's failure to visit essentially extended back to Kaitlyn's birth, but the trial court did not clarify when precisely Mother was in jail and prison.

Four, at the time of the filing of the petition to terminate and amended petition to terminate, willfulness was still part of the definition of abandonment rather than an affirmative defense. *See* Tenn. Code Ann. § 36-1-102 (1)(a)(i) (effective March 23, 2016 to June 30, 2016); Tenn. Code Ann. § 36-1-102 (1)(a)(i)(effective July 1, 2016 to June 30, 2018). In addressing the failure to visit ground for termination, in general, and the relevant four-month time period, specifically, the trial court made no finding as to willfulness. Furthermore, when addressing failure to support, the trial court operated under an express understanding that willfulness was an affirmative defense that had to be proven by Mother, a correct statement as to the current statute but not the version applicable in this case. The trial court faulted Mother for failing to raise this affirmative defense with regard to the ground for termination for failure to support. The burden, however, under the applicable version of the statute in the present case is upon Stephanie B. to demonstrate willfulness in establishing abandonment by failure to visit.

Five, we have not uncovered any references to willfulness in the trial transcripts. While there are indications that the parties appear to have understood the critical non-visitation time period as being pre-incarceration, there is not a corresponding indication from the record that the parties understood the importance of willfulness in litigating this matter.

The amalgamation of these complications ultimately proves too much to overcome with regard to the termination ground for failure to visit. Whether viewed primarily as a deficiency as to notice, proof, or factual findings, this ground for termination does not survive review on appeal. Accordingly, we reverse the trial court's finding that the termination ground of failure to visit was satisfied.

F. Willingness and Ability to Assume Custody and Risk of Substantial Harm

The trial court found clear and convincing evidence supported two grounds for termination: (1) a failure to manifest an ability or willingness to assume legal and physical custody and (2) that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. In finding these two grounds for termination to be established by clear and convincing evidence, the trial court cited "Tenn. Code Ann. § 36-1-113 (g)(9)(A)(4)" and "Tenn. Code Ann. §36-1-113 (g)(9)(A)(5)," respectively. As with the failure to visit ground addressed above, Stephanie B. cited the court to these provisions in her petition to terminate and amended petition to terminate. As with the failure to visit ground, the problem is that Tennessee Code Annotated sections 36-1-113 (g)(9)(A)(iv) and (v) apply to putative fathers, and Mother is not a putative father. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A).[11]

Unlike with the failure to visit ground for termination, this mistaken citation by the court and petitioner ultimately proves to be a harmless error. As to parents, a ground for termination exists where "[a] legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Thus, unlike Tennessee Code Annotated sections 36-1-113(g)(9)(A)(iv) and (v) where these are two separate grounds for termination for putative fathers, for legal parents, the provisions of both subsections (iv) and (v) must be satisfied to constitute a ground for termination. *In re J.S.*, No. M-2022-00142-COA-R3-PT, 2023 WL 139424, at *9 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) ("Considering these statutory measures, factor (g)(14) contains language similar to (g)(9)(A)(iv) and (v), but combines the two (g)(9) factors and requires proof of both to support termination under (g)(14).").

To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14) (effective July 1, 2016 to June 30, 2017); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child."

---

[11] There is no indication from the record that Mother regarded these statutory measures as inapplicable to her on that basis or presented any such argument to the trial court. In other words, we are not confronted with a case in which Mother's argument before the trial court was tied to the mistaken citation.

*Id*. at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id*. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome the obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). On the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court may instead consider "whether a parent has attempted 'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id*.

As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" but to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018). Tennessee appellate courts have upheld findings of risk of substantial harm as to severe psychological harm where there exists no meaningful relationship between the parent and child and where the child is currently living in a healthy and supportive environment and has a strong relationship with the child's current non-parent caretaker. *See In re J.S.*, 2023 WL 139424, at *11 & n.8.

Notice was provided that termination was being sought, though errantly, on the basis of these grounds. The parties litigated them as two grounds for termination rather than as conjoined elements of one ground for termination pursuant to (g)(14). Nevertheless, though (g)(14) was not cited, the allegations for the (g)(14) termination ground were stated in Stephanie B.'s petition wherein they were identified as grounds for termination of Mother's parental rights. These termination grounds were tried by the parties, and they were ruled upon by the trial court. Proving both grounds is a more arduous hurdle than proving one or the other, but proving both grounds separately as termination grounds is no less demanding in terms of proof than the two grounds conjoined as one termination ground.

In considering these grounds, the trial court found Mother lacked an ability and willingness to assume custody of Kaitlyn. In doing so, the trial court emphasized Mother's failure to address the action steps to recovering her child that were set forth by DCS. Significantly, the trial court also indicated that, despite living near Kaitlyn since her release from prison, Mother had failed to seek visitation or develop any type of meaningful

- 19 -

relationship with Kaitlyn. As for risk of substantial harm, the trial court emphasized the strong relationship between Kaitlyn and Stephanie B. in comparison with the non-existent relationship with Mother. The trial court concluded that Stephanie B. was "the only mother figure [Kaitlyn] has known." Ultimately, the trial court found that reuniting Kaitlyn and Mother posed a substantial risk of psychological harm to Kaitlyn. While the Stephanie B. and the trial court erred in their citations and trial court erred in finding two as opposed to one ground for termination, in the present case, this error was ultimately harmless in connection with the (g)(14) ground. We conclude that the trial court's finding of two termination grounds (g)(9)(A)(iv) and (v) cannot stand but that the record, findings, and adequate notice support the Tenn. Code Ann. § 36-1-113(g)(14) ground for termination.

IV.

If at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

- 20 -

Mother raises two challenges to the trial court's best interest decision. One, Mother contends that the trial court erred in relying upon the now-amended list of twenty best interest factors rather than the list of nine best interest factors in effect at the time Stephanie B. filed her termination petition and amended termination petition. Mother argues that the trial court's reliance on the new list constitutes reversible error. Two, Mother alternatively argues that the trial court reached the wrong conclusion with regard to the merits of its decision by finding termination to be in Kaitlyn's best interest. Much of Mother's argument with regard to this second contention is constructed upon an assertion that Mother was more actively engaged in visiting with Kaitlyn than the trial court concluded she was. We address these arguments in turn.

Stephanie B. filed the termination petition in May of 2016 and her amended petition in March of 2017. At these times, Tennessee's termination of parental rights statute directed courts to consider nine nonexclusive factors when determining whether termination is in a child's best interests. Tenn. Code Ann. § 36-1-113(i) (effective March 23, 2016 to June 30, 2016); Tenn. Code Ann. § 36-1-113(i) (effective July 1, 2016 to June 30, 2017). Subsequently, the Tennessee General Assembly amended section 113(i), expanding the list of best interest factors from nine to twenty. *See* 2021 Tenn. Pub. Acts ch. 190 § 1 (effective April 22, 2021). Though the parties and the court proceeded forward in this matter addressing the more extensive twenty factors list, our past cases have emphasized that "the amended statute only applies to petitions for termination filed on or after April 22, 2021." *In re Alessa H.*, No. M2021-01403-COA-R3-PT, 2022 WL 3332653, at *12 (Tenn. Ct. App. Aug. 12, 2022) (quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *13 n.10 (Tenn. Ct. App. Jan. 14, 2022), *perm. app. denied* (Tenn. Mar. 17, 2022)), *no perm. app. filed*. Consequently, the trial court should have considered the list of nine factors, not the expanded list of twenty factors.

Under Tennessee Code Annotated section 36-1-113(i), in determining the best interest of the child, the trial court, however, is "not limited to" consideration of the listed factors. Tenn. Code Ann. § 36-1-113(i) (effective March 23, 2016 to June 30, 2016); Tenn. Code Ann. § 36-1-113(i) (effective July 1, 2016 to June 30, 2017). This court has noted that because the prior version of the statute treated the nine factors as "non-exclusive," a court may consider additional arguments made in the context of a best interest analysis. *In re Audrey S.*, 182 S.W.3d at 878; *see also In re Riley S.*, 2022 WL 128482, at *13 n.10. "A trial court's application of the previous factors together with the new factors is not error if the factors considered are relevant to the facts presented by the case." *In re Nation F.*, No. W2023-00510-COA-R3-PT, 2024 WL 277960, at *6 (Tenn. Ct. App. Jan. 25, 2024) (citing *In re Mitchell B.*, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023), *no perm. app. filed*). Even when analysis is not structured in this manner, the trial court's decision to use the list of twenty factors instead of the list of nine factors is not, by itself, reversible error. *See In re Clara A.*, No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at *8 (Tenn. Ct. App. Feb. 1, 2023) ("[T]his Court has held that a trial court's reliance on the newer factors is not generally reversible error 'because the old

- 21 -

factors are essentially contained within the new factors.'" (quoting *In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022), *perm. app. denied* (Tenn. Aug.12, 2022))). "Because the statutory factors are not exclusive, regardless of which version of the statute is applicable, if the trial court's findings are sufficient to allow us to 'make a meaningful review' of its best-interest determination, then remand is unnecessary." *In re Nation F.*, 2024 WL 277960, at *6 (citing *In re Mitchell B.*, 2023 WL 3619561, at *6). In the present case, the trial court's findings are sufficiently detailed to allow this court to consider the nine statutorily identified factors and to consider the other factors as additional considerations by the trial court in assessing Kaitlyn's best interest. *See In re Chance B. et al.*, No. M-2023-00279-COA-R3-PT, 2024 WL 764015, at *11 (Tenn. Ct. App. Feb. 26, 2024).

The list of nonexclusive factors that apply to Father and Stepmother's termination petition are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (effective March 23, 2016 to June 30, 2016); Tenn. Code Ann. § 36-1-113(i) (effective July 1, 2016 to June 30, 2017).

The first factor considers whether the parent's circumstances have remained substantially the same or if the parent has overcome obstacles standing in the way of successful custody. The relevant findings in connection with this factor are contradictory in such a manner so as to prevent weight from being placed upon it. On the one the hand, the trial court credited Mr. Pierson's testimony, finding him to be a credible witness. The trial court specifically noted that Mr. Pierson testified that "Mother does a good job of parenting." Additionally, Mr. Pierson testified that the home he shares with Mother is a safe environment for the four children already in Mother's custody and would be safe as a future home for Kaitlyn. On the other hand, the trial court concluded that "Mother is incompetent to adequately provide for the care and supervision of Kaitlyn. Mother's decision-making skills and parenting skills are substantially impaired." The trial court did not, however, explain this conclusion, and given the lack of further clarification from the trial court, it is difficult to fully square this conclusion with the trial court's embrace of Mr. Pierson's testimony that Mother does a "good job of parenting." Given the seemingly contradictory findings, we are wary of putting weight on this factor in supporting termination of Mother's parental rights.

The second factor turns on a parent's adjustments after the reasonable efforts of a social services agency, such as the Department of Children's Services. DCS did formulate a plan for Mother, though it was not introduced into evidence in this case. The trial court concluded that Mother had not adhered to the plan by failing to access services at Centerstone and by not providing support for and visiting Kaitlyn. No evidence was presented to address DCS's efforts to assist Mother, preventing any determination as to whether those efforts were reasonable. Given this lack of evidence as to DCS's efforts, this factor does not support termination.

The third factor deals with the parent's visitation. Concerns about failure to visit as a termination ground, such as notice, are not present when considering lack of visitation as a best interest factor in this case. While Mother argues on appeal that she visited with Kaitlyn regularly during Kaitlyn's time with Mother's relatives, the trial court unambiguously concluded that this was untrue. The trial court determined that Mother took almost no action to try to visit with Kaitlyn after being released from prison, and only

tried to visit Kaitlyn once during the initial years after her release. Even the most favorable view of the trial court's findings as to Mother with regard visitation provide for an understanding of Mother as having engaged in some token visitation post-2019. Simply stated, the trial court concluded that Mother did not take meaningful action to visit her child. While Mother argues on appeal that this is incorrect, the trial court factual findings on this matter are based upon a credibility determination.[12] The record supports the trial court's findings as to visitation.

The fourth and fifth factors both center upon Kaitlyn's relationships with the parties. The trial court unambiguously determined that Kaitlyn had no meaningful relationship with Mother and that Mother had not made an effort to have a relationship with Kaitlyn. The trial court noted that "[b]efore, during, and after Mother's incarceration, she has never even attempted to contact Kaitlyn. She has not sent any letters, birthday cards, holidays cards, or any correspondence." In contrast, the trial court determined that Kaitlyn has developed a strong bond and mother-child relationship with Stephanie B. The trial court concluded that Kaitlyn is thriving in Stephanie B.'s care. Kaitlyn is excelling in school, enjoying developing hobbies, and creating a lifelong bond with Stephanie B. The trial court noted that Kaitlyn has been in Stephanie B.'s care from three days after her birth and that her home with Stephanie B. is the only home that Kaitlyn has ever known. Reflecting on Kaitlyn's relationship with Stephanie B., the trial court determined that Stephanie B. has been "Kaitlyn's mother figure for all her life." The trial court concluded that Kaitlyn would suffer severe psychological harm from attempting to establish a relationship between Mother and Kaitlyn and from interfering with Stephanie B.'s relationship with Kaitlyn. The record supports the trial court's findings in relation to these factors, which support termination.

With regard to the sixth factor, which addresses child brutality and neglect, the trial court noted the 2015 dependency and neglect order entered concerning Kaitlyn as well as Mother's guilty plea to one count of aggravated attempted child neglect and her corresponding eight-year sentence. The record supports the trial court's findings related to this factor, which supports termination.

The seventh factor, relating to the health and safety of the home, accounts for present

---

[12] "One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations." *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). As stated by the Tennessee Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012).

circumstances and potential future neglect. The trial court worried that reuniting Kaitlyn with Mother would lead to further abuse and neglect. Outside of recognizing that Mother had been imprisoned for child neglect and that Kaitlyn had been adjudicated dependent and neglected in 2015, the trial court did not otherwise explain why it expected abuse or neglect to continue *in the future* if Kaitlyn were reunited with Mother. Again, Mr. Pierson provided countervailing testimony, which the court specifically noted and deemed credible, that the current home environment is a safe one in which Mother parents well. Accordingly, given these seemingly conflicting factual findings, we cannot, without further clarification, conclude this factor favors termination.

Moving to the eighth factor, which addresses Mother's mental state and whether it would impede Kaitlyn's growth and development, Stephanie B. did not present proof that Mother had an unfit mental state to parent Kaitlyn. The trial court acknowledged this lack of proof; nevertheless, the trial court stated that "Mother's mental or emotional fitness would be detrimental to Kaitlyn." The trial court failed to further clarify the basis for its determination. Mr. Pierson testified that Mother was parenting well and their home together was a safe environment for the four children as to whom custody had been restored for Mother. The trial court accredited Mr. Pierson's testimony as being credible. Given the seemingly contradictory findings, we cannot conclude that this factor supports termination.

The ninth factor addresses Mother's financial support of Kaitlyn. The notice concerns with the termination ground for failure to support are not present with regard to failure to support as a factor in the best interest analysis. The only support Mother sent to Stephanie B. to use in furthering Kaitlyn's care was one contribution of $40, an item of clothing, and some diapers. When asked why she had not sent Stephanie B. financial support in the years following her release, Mother responded, "I have no reason." Mother claimed to have been providing money and support through her relatives, but the trial court found this testimony was untrue. The best testimony Betty J. could offer in favor of Mother on this point was that Mother "buys stuff. She don't give me any money." Overall, the trial court did not find Betty J.'s testimony convincing, noting that her testimony was "unclear and confusing." The trial court noted Mother's employment after her release from prison, including a $40,000 per year income, and her ability to provide some measure of support for Kaitlyn. The trial court concluded that Mother simply failed to provide support for Kaitlyn. Ultimately, the trial court determined that "Mother has not done anything to assist in meeting Kaitlyn's basic material, educational, housing, and safety needs." The record supports the trial court's findings, which support termination.

As to other grounds, the trial concluded that terminating Mother's parental rights would not negatively effect Kaitlyn's need for continuity and stability because Kaitlyn has never lived with Mother and has had little contact and no meaningful relationship with her. The trial court also observed that Mother had never contributed to providing a stable home, having turned Kaitlyn over to the care of Stephanie B. when she was only three days old.

These factors are relevant to the best interest analysis, and there is no error in the trial court having considered them.

"This court has repeatedly indicated that '[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest.'" *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023) (*In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020)). The trial court concluded, and the the record supports, that Kaitlyn does not have a meaningful relationship with Mother. In fact, the trial court concluded the relationship between the two was "nonexistent." In the midst of an investigation into severe child abuse perpetrated against her children which ultimately resulted in a finding of dependency and neglect and Mother convicted with an eight-year sentence imposed, Mother turned care of Kaitlyn over at three days of age to Stephanie B. This was to be a short-term arrangement, but Mother failed to maintain communication with Stephanie B. Mother did not call or write letters to Kaitlyn. She did not send birthday or holiday cards. When released from prison, she did not seek to visit Kaitlyn. Mother not only failed to visit she also failed to support. The trial court concluded that Mother could provide support, but simply failed to do so. Mother failed to explain why she failed to provide support. The trial court concluded that Mother instead lied in her testimony about her relationship with Kaitlyn and support that she claimed to have provided. Kaitlyn grew up with Stephanie B.'s home as her home and Stephanie B. as the mother figure in her life. In contrast to the lack of relationship with Mother, the trial court found a strong and healthy mother-child relationship between Stephanie B. and Kaitlyn. The trial court concluded that Kaitlyn is thriving in her current environment with Stephanie B., and the trial court concluded that reuniting with Mother and interfering with Kaitlyn's mother-child relationship with Stephanie B. would cause severe psychological injury to Kaitlyn. The record supports the trial court's findings and conclusions.

"While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that [Kaitlyn's life] will not be improved by a reintroduction to Mother." *In re Chayson D.*, 2023 WL 3451538, at *15 (citation omitted). The best interest analysis turns on what outcome would be best for Kaitlyn in this situation. We find no error with the trial court's conclusion that her best interest supports termination of Mother's parental rights. We conclude that clear and convincing evidence supports the trial court's conclusion.

V.

In considering the arguments advanced on appeal and for the reasons discussed above, we reverse in part and affirm in part the judgment of the trial court. The costs of the appeal are taxed to the appellant, Quinteoria D., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and

consistent with this opinion.

_____
JEFFREY USMAN, JUDGE